IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| GEORGE ROBERT DUROSE,<br><br>               Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>               Defendant. | CV 17-111-BLG-TJC<br><br><br>**ORDER** |

On August 24, 2017, Plaintiff George Robert Durose ("Plaintiff") filed a

Complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting

judicial review of the final administrative decision of the Commissioner of Social

Security ("Commissioner" or "Defendant") regarding the denial of his claim for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401-433.  (Doc. 1.)  On October 31, 2017, Defendant filed the Administrative

Record ("A.R.").  (Doc. 6.)

Presently before the Court is Plaintiff's motion for summary judgment,

seeking reversal of Defendant's denial and remand for an award of disability

benefits, or alternatively for further administrative proceedings.  (Doc. 12.)  The

motion is fully briefed and ripe for the Court's review.  (Docs. 13, 14.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the ALJ's decision should be **AFFIRMED**.

## I.   PROCEDURAL BACKGROUND

Plaintiff filed an application for disability insurance benefits on December 5, 2013.  (A.R. 162-169.)  Plaintiff alleged he has been unable to work since October 13, 2013 due to his disabling condition.  (A.R. 162.)  The Social Security Administration denied Plaintiff's application initially on May 5, 2014, and upon reconsideration on October 10, 2014.  (A.R. 87-98; 99-110.)

On December 5, 2014, Plaintiff filed a written request for a hearing.  (A.R. 118-119.)  Administrative Law Judge Michael Kilroy (the "ALJ") held a hearing on November 24, 2015.  (A.R. 36-86.)  On December 24, 2015, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 21-31.)

Plaintiff requested review of the decision, and on June 27, 2017, the Appeals Council denied Plaintiff's request for review.  (A.R. 4-9.)  Thereafter, Plaintiff filed the instant action.

## II.   LEGAL STANDARDS

### A.   Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the

Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the

Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.      Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1.  Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social

Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

/ / /

## III.  FACTUAL BACKGROUND

### A.  The Hearing

A hearing was held before the ALJ in Billings, Montana on November 24, 2015.  (A.R. 36-86.)  Plaintiff testified that he has not worked since October 2013.  (A.R. 45.)  Plaintiff explained that he left his last job as a mechanic due to pain in his hands, shoulders and back.  (A.R. 49-50.)  At the time of the hearing, Plaintiff was enrolled in school, and was studying private investigation through vocational rehabilitation.  (A.R. 46-48.)

As to his physical limitations, Plaintiff testified that his hands are very painful and his grip is weak.  (A.R. 54.)  He stated he has difficulties with activities such as shaving, cutting vegetables, tying his shoes, and driving.  (A.R. 55-56.)  His ankles and hips are also stiff and sore, and he can only walk a couple of blocks before needing to take a break.  (A.R. 57.)  Plaintiff also has difficulty sitting, and needs to change positions after 20 minutes.  (A.R. 58-60.)

Plaintiff stated that on a typical day he gets out of bed around 8:00 a.m., and will start a load of laundry or a project outside.  (A.R. 61.)  He will take a break about 20 minutes later, and will rest for 20 to 30 minutes.  (A.R. 61-62.)  He makes a simple lunch around 11:00 a.m.  (A.R. 61.)  Throughout the day he feeds his pets, including chickens, which entails carrying a 5 gallon bucket of water.  (A.R. 62, 77-76.)  Plaintiff starts preparing dinner at 5:00 p.m., but does not eat until 7:30 or

8:00 p.m. (A.R. 65.) In the evening, he will watch television until he goes to bed around 9:00 p.m. (A.R. 65.) Plaintiff stated he does not sleep well, and wakes up every two hours due to pain in his shoulders, hands, hips, lower back, knee, and ankle. (A.R. 66.)

Plaintiff testified that he has not had health insurance since 2013. (A.R. 77.) As a result, he did not want to go in for appointments with his doctor because he could not afford the visit. (A.R. 77.) He said his doctor, Dr. Mehia, will allow him to pick up medications from her office without seeing her for an examination. (A.R. 78.)

## B. Medical Evidence[1]

### a. *Denise Mehia, M.D.*

Dr. Mehia is Plaintiff's primary care physician. In January 2013, Dr. Mehia noted that Plaintiff was doing well following a cervical discectomy and fusion surgery in October of 2012, and was no longer having pain in his neck or upper extremities. (A.R. 407, 409.) She did note, however, that he reported problems with his ankle joints and wrists. (A.R. 406.)

---

[1] The administrative record includes Plaintiff's medical records from several health care providers. The Court has summarized only those records that are relevant to the specific issues presented for review.

In October 2013, Plaintiff reported that he was aching all over, and that his neck, right shoulder, knees, right hip and ankle joints had been getting worse over the previous couple of months.  (A.R. 401.)  Plaintiff also reported a recurrence of neck discomfort.  (*Id.*)  Dr. Mehia referred Plaintiff to rheumatologist Dr. Arguelles to rule out rheumatoid arthritis.  (*Id.*)

In January 2014, Plaintiff continued to complain of joint ache, and reported that he felt the arthritis medication Dr. Mehia prescribed was not helping.  (A.R. 400.)  In May 2014, Plaintiff reported continued pain in his ankle joints and shoulders, especially after doing light work.  (A.R. 398.)  He also indicated pain was waking him up at night.  (*Id.*)

In January 2015, Dr. Mehia had a discussion with Plaintiff regarding obtaining tests and a definite diagnosis "for the benefit of the Disability Bureau." (A.R. 427.)  Dr. Mehia noted that she tried unsuccessfully to negotiate with Dr. Arguelles regarding the costs of the diagnostic tests.  (A.R. 427-428.)

In May 2015, Plaintiff reported having problems with his right shoulder. (A.R. 429.)  Dr. Mehia referred Plaintiff to see orthopedist, Dr. Klepps for a consultation.  (*Id.*)

b. *Enrico F. Arguelles, M.D.*

Plaintiff saw Dr. Arguelles, a rheumatologist, on November 11, 2013, for evaluation of his musculoskeletal pain complaints.  (A.R. 362-69.)  Dr. Arguelles

noted that Plaintiff had neck surgery in October 2012, which helped for a year, but his symptoms had recurred, and he had significant achy stiffness and pain in his neck.  (A.R. 363.)  Dr. Arguelles noted Plaintiff reported functioning poorly, having difficulty grasping small objects, using stairs, and reaching behind his back.  (*Id.*)  Upon examination, Dr. Arguelles stated Plaintiff was tender to palpitation in several joints.  (A.R. 366.)

Dr. Arguelles stated further testing and imaging studies were necessary to confirm a diagnosis.  (A.R. 369.)  Dr. Arguelles noted the testing was expensive, but he also gave Plaintiff the "option of minimizing studies as well as obtaining x-ray elsewhere where they can get financial help."  (*Id.*)  Dr. Arguelles indicated Plaintiff's possible diagnosis included fibromyalgia, rheumatoid arthritis, ankylosing spondylitis, inflammatory myopathy, Sjogren's with sicca, and PMR (Polymyalgia Rheumatica) without GCA (Giant Cell Arteritis).  (*Id.*)  Dr. Arguelles prescribed Meloxicam because it was less expensive than the Celebrex Plaintiff had been using.  (*Id.*)

c.      *Dr. Steven Klepps, M.D.*

Plaintiff saw Dr. Klepps, an orthopedist, on June 4, 2015 for evaluation of his right shoulder.  (A.R. 430-32.)  Dr. Klepps stated Plaintiff exhibited pain and weakness consistent with a rotator cuff tear.  (A.R. 432.)  Dr. Klepps stated Plaintiff's rotator cuff tear that was present in a May 2011 MRI had likely

progressed.  (A.R. 431-33.)  He recommended repeating an MRI and surgery.

(A.R. 432.)  Plaintiff declined because he did not want surgery, given his lack of

response to his neck surgery.  (*Id.*)

> d.    *David Healow, M.D.*

Plaintiff underwent a consultative physical examination by David Healow,

MD, a non-treating examiner on April 12, 2014.  Dr. Healow described Plaintiff as

a "well appearing man" with a "normal gait," but who seemed very sad and close

to tears.  (A.R. 379.)  Dr. Healow observed that Plaintiff could remove and replace

his shoes and socks without difficulty (A.R. 379), and could sit and rise to a

standing position without assistance.  (A.R. 380.)

On examination, Plaintiff had palpable tenderness in the cervical and mid

thoracic spine, but none in the lumbar region.  He also had palpation tenderness in

his shoulders, wrists, hand joints and right knee.  (A.R. 380.)  Nevertheless,

Plaintiff displayed above average strength of his upper extremities in all motions

tested; no joint effusion; he was able to lift and carry light objects; his fine manual

motor dexterity was intact; he could bend forward with his fingertips to the top of

his feet; he was able to perform a partial squat without assistance; and his straight

leg tests were negative bilaterally.  (A.R. 381.)  Plaintiff's range of shoulder

motion was somewhat impaired, but he otherwise had full range of motion in his

elbows, wrists, and hands.  (A.R. 382.)

Dr. Healow's impression was that the Plaintiff "is able to sit, stand and walk unassisted and can handle objects with both gross and fine manual motor dexterity." (A.R. 385.) He found no weakness or sensory loss on his neurologic examination. While he had some restriction in overhead movement in both shoulders, Dr. Healow found Plaintiff to be "quite strong in all movement without identifiable weakness." *Id.* Dr. Healow found no physical or x-ray evidence justifying restriction in standing, walking or sitting, although he acknowledged that a rheumatology workup may be helpful. *Id.* He also found that degenerative changes shown on x-ray would "justify mild restriction in activities loading the lumbar spine." *Id.* Nevertheless, he found that "[p]hysically he appears to be capable of at least moderate intensity work but he clearly does not believe it." *Id.*

## C.   The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of October 13, 2013 through his last insured date of June 30, 2014. (A.R. 23.) Second, the ALJ found that Plaintiff has the following severe impairments: "cervical and lumbar degenerative disc disease, obesity, left shoulder tendinosis and labral tear, history of right shoulder rotator cuff repair, arthralgias in upper and lower extremity joints." (*Id.*) Third, the ALJ found that Plaintiff does not have an impairment or

11

combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments. (A.R. 25-26.) Fourth, the ALJ stated Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) except he can walk/stand up to 4 hours total per 8 hour workday. He can sit for 6 hours total per day (with normal breaks), not to exceed 1 hour at one time. He can lift/carry 20 pounds occasionally, and lift/carry 10 pounds or less frequently. With his bilateral upper extremities he can reach/lift overhead occasionally, not to exceed a weight of 2 pounds. He can never crawl or climb ladders/scaffolds. He can occasionally stoop, kneel, crouch, crawl, balance, and climb stairs. He must avoid concentrated exposure to extreme cold and vibrations. He can frequently perform fine and gross manipulations with his bilateral upper extremities.

(A.R. 26.)

The ALJ next found that Plaintiff is unable to perform any of his past relevant work. (A.R. 29-30.) Finally, the ALJ found Plaintiff could perform other jobs that exist in significant numbers in the national economy in light of his age, education, work experience, and RFC. (A.R. 30-31.) Thus, the ALJ found that Plaintiff was not disabled. (A.R. 31.)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) improperly discrediting his testimony; (2) failing to consider his inability to afford medical care; (3) determining he met the definition for light work; (4) failing to find him disabled under the Medical Vocational Guidelines Rules 201.10; and (5) failing to

incorporate all of his impairments into the vocational consultant's hypothetical questioning. (Doc. 12 at 5.) Plaintiff also indicated in the body of his opening brief that the ALJ erred in ignoring the findings and opinions of his treating physicians, Dr. Klepps, Dr. Mehia, and Dr. Arguelles. (Doc. 12 at 23-24.)

### A. The ALJ's Credibility Determination and Consideration of Plaintiff's Ability to Afford Medical Treatment

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ failed to provide clear and convincing reasons for rejecting his testimony. Plaintiff also argues the ALJ did not describe with specificity what parts of his testimony departed from the record. Plaintiff further argues the ALJ improperly made an adverse credibility finding without considering his inability to afford medical care. The Commissioner counters that the ALJ properly discounted Plaintiff's symptom testimony.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if he provides "specific, clear and convincing reasons" for doing so. *Id.* "In

order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the first step of the credibility analysis is not at issue. The ALJ properly determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding his symptoms. The Court finds the ALJ did so.

The ALJ's credibility determination is not articulated with ideal specificity. Nevertheless, the ALJ's decision can be fairly read to include several valid bases for discounting Plaintiff's testimony concerning the persistence and severity of his physical pain and limitations.

First, with respect to Plaintiff's report of recurring neck pain, the ALJ pointed out that Plaintiff had previously undergone a cervical discectomy and fusion at C5-C7 in October 2012. Subsequent treatment notes up to April 2013 indicated he was doing very well. (A.R. 27.) While Plaintiff did report a recurrence of cervical symptoms in October 2013, the medical records noted by the ALJ do show that Plaintiff was symptom free within six months of his alleged onset date. The records state he was "doing very well and has no neck pain and no arm pain." (A.R. 361.) He had gone back to work full-time without restrictions, and did not have a loss of mobility, despite the fusion. *Id.*

Plaintiff had also been previously treated for lumbar pain in 2011. The ALJ noted that he was treated with physical therapy in December 2011 and January 2012. The treatment notes from the therapy indicate he was doing well and feeling better. (A.R. 335-338.) As the ALJ noted, he cancelled or did not appear for his sessions in November and December 2011, and was ultimately discharged from therapy. (A.R. 336.)

/ / /

With respect to his shoulder pain, the ALJ noted that he was treated for shoulder tendinosis and a labral tear in April 2012.  But he did not mention or complain of shoulder pain to any provider again for approximately 18 months, when he reported shoulder pain to Dr. Mehia in October 2013.  (A.R. 28.)

The ALJ also pointed to Dr. Healow's examination and findings, which revealed very little in the form of objective findings to support Plaintiff's reported physical limitations.  The ALJ found Dr. Healow's "exam findings and imaging scans are supportive of the ability to perform work activity within the confines of the residual functional capacity.  Indeed, Dr. Healow felt the claimant's physical limitations would allow for moderate intensity work, although he never defined moderate."  (A.R. 28.)

Finally, he noted that Plaintiff saw Dr. Mehia in December 2014, "only a few months past the date of last insured."  (Ar.R. 29.)  At that time he was seen for complaints of "malaise, sore throat and cough," but "did not mention any musculoskeletal pain or limitations at that time."  (A.R. 29.)

Therefore, the ALJ concluded that Plaintiff's "alleged ankle, shoulder, neck, and lower back pains were not demonstrated to be as severe or persistent as alleged."  (A.R. 29.)

Ultimately, the Court finds that the ALJ's reasons for discounting Plaintiff's testimony were sufficient.  The ALJ found that Plaintiff's testimony regarding the

severity and persistence of his pain and limitations were "not entirely credible," and he cited specific evidence in the record which he interpreted to contradict Plaintiff's testimony. Although this Court may not evaluate the evidence in the same way as the ALJ, the Court may not substitute its own interpretation of the evidence for the ALJ's interpretation. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Plaintiff argues, however, that the "ALJ made an adverse credibility finding based upon a failure to consider [Plaintiff's] financial inability to afford medical care." (Doc. 12 at 18.) It is assumed Plaintiff maintains that the ALJ made an adverse credibility finding based upon the conservative nature of his treatment, without considering Plaintiff's ability pay to for additional treatment. Plaintiff does not identify where the ALJ made such a determination. But the ALJ did note that Plaintiff only saw the rheumatologist Dr. Arguelles once, and that Dr. Mehia merely prescribed Flexeril to help him sleep and did not perform a focal examination. (A.R. 28-29.)

Evidence of conservative treatment may be "sufficient to discount a claimant's testimony regarding the severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007). However, a conservative course of treatment "is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment." *Carmickle v. Comm'r*

*Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). The Ninth Circuit has recognized that the inability to afford treatment constitutes such a reason. *See e.g. Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (stating the claimant's "failure to receive medical treatment during the period that he had no medical insurance cannot support an adverse credibility finding"); *Gamble v. Charter*, 68 F.3d 319, 322 (9th Cir. 1995) ("It flies in the face of the patent purpose of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him."). *See also Williams v. Berryhill*, 2017 WL 5760924, *5 (D. Mont. Sept. 28, 2017) (finding "the ALJ erred by discounting [the plaintiff's] symptom testimony based on her conservative course of treatment without considering her explanation that she could not afford more aggressive treatment during the relevant period"). [2]

In this case, however, it does not appear that the ALJ discounted the Plaintiff's credibility based upon the conservative nature of his treatment. For

---

[2] The Commissioner asserts the law in effect at the time of the ALJ's decision did not require ALJ to consider Plaintiff's ability to afford care. The Commissioner is mistaken. Social Security Ruling 96-7p, which was in effect at the time of the ALJ's decision, provided the ALJ may not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, available at 1996 WL 374186, *7. The Ruling specifically cited an individual's inability to afford treatment as an example of an explanation that the ALJ could consider. *Id.* at *7-8.

example, the statement relative to seeing Dr. Arguelles on only one occasion, was made in connection with the ALJ's determination of how much weight to afford Dr. Arguelles's opinion.  (A.R. 28.)

Nevertheless, to the extent the ALJ erred in failing to consider Plaintiff's ability to afford additional care, the error was harmless.  The Ninth Circuit has recognized that "an ALJ's error [is] harmless where the ALJ provide[s] one or more invalid reasons for disbelieving a claimant's testimony, but also provide[s] valid reasons that [are] supported by the record."  *Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012).  The "error is harmless so long as there remains substantial evidence supporting the ALJ's decision and he error 'does not negate the validity of the ALJ's ultimate conclusion.'"  *Id.* (Quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).  As discussed above, the ALJ provided other valid reasons for discounting Plaintiff's credibility concerning the severity and persistence of his pain and limitations that are supported by the record.

Therefore, the Court finds that the ALJ's credibility finding is properly supported by specific, clear and convincing reasons.

/ / /

/ / /

/ / /

**B.      Consideration of the Treating Physicians' Opinions**

Plaintiff contends that the ALJ erred in ignoring the findings and opinions of Dr. Arguelles, Dr. Mehia and Dr. Klepps.  In response, the Commissioner argues Plaintiff fails to show any error with regard to these providers.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.)  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is generally entitled to the greatest weight.  *Id*.  ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  *Lester*, 81 F.3d at 830.

In his decision, the ALJ gave Dr. Arguelles' proposed diagnoses "little weight."  (A.R. 28.)  The ALJ determined Dr. Arguelles' proposed diagnoses were not entitled to controlling weight because they were not confirmed with further treatment.  (*Id.*)  The ALJ also discussed some of Dr. Mehia's treatment notes

(A.R. 28-29), but did not address what weight, if any, he assigned the notes.  The ALJ did not mention or discuss Dr. Klepps at all.

The only documents in the record from Dr. Arguelles, Dr. Mehia, and Dr. Klepps were treatment notes; none of these physicians offered medical opinions concerning Plaintiff's functional capacity.  Treatment notes, in general, do not constitute medical opinions.  *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").  Because Dr. Arguelles, Dr. Mehia, and Dr. Klepps did not offer opinions regarding Plaintiff's limitations or ability to work, their treatment notes do not constitute medical opinions the ALJ must weigh.  *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions.").

Accordingly, the Court finds the ALJ did not err with respect to Dr. Arguelles, Dr. Mehia, or Dr. Klepps.

/ / /

## C.     The ALJ's Determination that Plaintiff Could Perform Light Work

Plaintiff argues the ALJ erroneously determined Plaintiff could perform light work.  The Commissioner counters that the ALJ properly determined Plaintiff could perform a modified range of light work.

If a claimant shows he cannot return to previous work, the burden of proof shifts to the Commissioner at step five to show that the claimant can do other kinds of work.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  The Commissioner may meet this burden by either using a vocational expert or by relying on the Medical Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, app. 2.  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  The Medical Vocational Guidelines are a matrix system that provide a uniform method for determining the availability of jobs.  The Guidelines are commonly known as "the grids."  *Id.*  The grids categorize jobs by their physical-exertional requirements, and consist of three separate tables for sedentary work, light work, and medium work.  *Id.*  Each grid presents various combinations of factors, including the claimant's age, education, and previous work experience.  *Id.*  For each combination of these factors, the grids direct a finding of either disabled or not disabled.  *Id.*

/ / /

/ / /

/ / /

The ALJ must apply the grids when the claimant suffers solely from exertional limitations.[3] *Cooper v. Sullivan*, 880 F.2d 1152, 1155 (9th Cir. 1989). If, however, the claimant's limitations are both exertional and non-exertional,[4] the grids must be consulted, but if they "do not resolve the disability question, other testimony is required." *Id.*; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1). In such a case "the testimony of a vocational expert is required to identify specific jobs within the claimant's abilities." *Polny v. Bowen*, 864 F.2d 661, 663-64 (9th Cir. 1988). Thus, the grids may only be used where they "completely and accurately represent a claimant's limitations. In other words, a claimant must be able to perform the *full range* of jobs in a given category, i.e., sedentary work, light work, or medium work." *Tackett*, 180 F.3d at 1101.

"Light work" is defined as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

---

[3] Exertional limitations are strength-related limitations. *Cooper*, 880 F.2d at 1155 n.6.

[4] Non-exertional limitations include mental, sensory, postural, manipulative and environmental limitations. *Id.* at 1155 n.7.

Plaintiff argues the ALJ erroneously found he was capable of light work because the ALJ determined he was only capable of standing or walking for 4 hours per 8 hour workday. Plaintiff asserts this limitation exceeds the light work requirement of being able to do "a good deal of walking or standing." 20 C.F.R. § 404.1567(b). Plaintiff further contends the ALJ's finding does not meet the alternative light work requirement of being able to "sit[] most of the time with some pushing and pulling or arm or leg controls," because the ALJ made no finding relative to his legs.

Plaintiff's argument would be persuasive had the ALJ relied solely on the grids or found he was capable of a full range of light work. Here, however, the ALJ used the grids as a framework, but also obtained testimony from a vocational expert because Plaintiff had non-exertional limitations. (A.R. 30.) The ALJ posed a hypothetical question to the vocational expert that included specific limitations for a modified range of light work. (A.R. 79-80.) Thus, the ALJ did not find Plaintiff was capable of a full range of light work, but rather a modified range of light work. (A.R. 26, 30.)

Therefore, the Court finds the ALJ did not err in finding Plaintiff could perform light work.

/ / /

**/ / /**

24

**D.     Application of Medical Vocational Guidelines Rules 201.10 and The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.**

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422

Plaintiff argues that the only hypothetical the ALJ relied on to find there are jobs he can perform did not include all of his impairments, including pain. Plaintiff further argues that had his testimony been credited, he would have been found disabled under Medical Vocational Guidelines Rule 201.10. As discussed above, the Court has determined the ALJ adequately supported his reasons for discounting Plaintiff's testimony and the medical source evidence. Accordingly, the hypotheticals the ALJ relied on properly accounted for all of Plaintiff's limitations that the ALJ found credible and supported by evidence in the record.

Therefore, the Court finds the ALJ's determination at step five is supported by substantial evidence.

## V.    CONCLUSION

Based on the foregoing,  **IT IS ORDERED** that the Commissioner's decision denying Plaintiff's claim for disability insurance benefits is **AFFIRMED**, and Plaintiff's motion for summary judgment (Doc. 12) is **DENIED**.

**IT IS ORDERED**.

DATED this 30th day of September, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge